**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3646
_____

KENNETH JOHNSON,

Appellant

v.

JOSEPH R. FUENTES; JOSEPH M. CAMPBELL;
JOHN J. SILVER; JOHN DOES 1 TO 10;
DIVISION OF STATE POLICE WITHIN THE DEPARTMENT OF LAW AND
PUBLIC SAFETY OF THE STATE OF NEW JERSEY;
ATTORNEY GENERAL OF THE STATE OF NEW JERSEY
_____

APPEAL FROM THE DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
(D.C. No. 3-12-cv-04850)
District Judge: Hon. Peter G. Sheridan
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
July 11, 2017
_____

Before: GREENAWAY, JR., SHWARTZ, and RENDELL, <u>Circuit Judges</u>.

(Filed: August 3, 2017)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

SHWARTZ, <u>Circuit Judge</u>.

Kenneth Johnson appeals the District Court's order granting summary judgment in favor of Defendants Joseph Fuentes and John Silver (collectively, the "Defendants") on Johnson's claim that they violated 42 U.S.C. § 1983 by engaging in race discrimination. Because Johnson has not adduced evidence from which a reasonable jury could conclude that he was subject to race discrimination, we will affirm the District Court's order.

I

A

The events giving rise to this lawsuit began in 2011. At that time, Johnson, an African-American trooper who joined the New Jersey State Police in 1983, was a Lieutenant in charge of one of three units that focused on drug trafficking. Fuentes was the Superintendent of the State Police and controlled its disciplinary system, and Silver was Johnson's commanding officer.

The first event stemmed from a failed attempt to infiltrate a drug-trafficking organization. Johnson's assistant unit head, without Johnson's knowledge, allowed investigators to insert a police-owned trailer into a drug organization. The operation failed, and the police nearly lost the trailer. As a result, on April 11, 2011, Silver told Johnson that he disapproved of how Johnson supervised his unit and that his unit was being investigated.[1] Two days later, Silver again told Johnson that he "had a problem" with how the drug investigation had been conducted, App. 84, 101, and that if he did not

---

[1] There is nothing in the record showing that either of the other two units, which were led by white officers, were involved in the trailer case. **App. 84, 101, 132.**

"get things together," Silver was going to file an internal affairs complaint against him, App. 84. Silver never filed such a complaint against Johnson.

Silver chastised Johnson a third time approximately two weeks later because Johnson's unit had not provided a timeline related to an investigation being handled by the New Jersey Attorney General's Office. As a result, on April 26, 2011, Silver demanded that Johnson provide the timeline or "face consequences." App. 86, 104. Johnson did not suffer any consequences regarding the timeline.

In July 2011, Silver, as the Commanding Officer of the Intelligence Section, via the Acting Deputy Superintendent, formally asked Fuentes to transfer nineteen officers, including Johnson, to other positions and locations. These individuals represented various races and ethnic groups and ten had the same rank as Johnson. According to Silver, these transfers were made for the purposes of career development, to utilize the officers' talents better, and to invigorate various units.

Johnson questioned whether Silver transferred him for career advancement reasons because, at that time, Johnson was 49, and the State Police's mandatory retirement age is 55. Moreover, Johnson's captain told Johnson that the transfer was entirely Silver's decision, and an assistant bureau chief told Johnson that Silver transferred Johnson because he disliked him. While neither of these individuals said the transfer was due to Johnson's race, Johnson recounted two occasions when Silver used racially charged language in connection with the transfer. First, during a June 7, 2011 confrontation about Johnson's management of his unit, Silver said "that if it was up to [Silver], [Johnson's] black ass would have been transferred already." App. 105. Second,

when Silver told Johnson on July 21, 2011, that Johnson would be transferred from Howell to the Intelligence Unit in West Paterson, and Johnson questioned the transfer, Johnson testified that Silver replied, "hey, what's a little ride, you'll be with your brothers up in Paterson, what are you complaining about." App. 107. Johnson believed that Silver harbored an animus toward African-Americans for personal reasons and that Fuentes knew about this animus when he assigned Silver to be his commander.

Johnson's transfer to West Paterson increased his commute, but he was provided with a car and the State Police paid for gasoline and maintenance. Several other transferred unit heads had to drive similar distances to their new assignments.[2]

Because Johnson's transfer occurred during the 2011 performance cycle, his performance evaluation for that year included both his work under Silver and his West Paterson assignment. For the 2011 year, Johnson received exceptional ratings in all but one category.[3] The evaluation made no mention of any of the April 2011 incidents and contained no criticism.

In 2012, Johnson attempted to retire three times but asserts that he was not permitted to do so because of a then-pending disciplinary proceeding arising from events in 2008 wherein Johnson allegedly failed to timely report to his superiors the possible

---

[2] Also in 2011, a citizen who complained of racial profiling identified Johnson in a photo array. The array, which featured only black troopers, portrayed him in uniform, and the citizen's complaint concerned police on the New Jersey Turnpike; however, Johnson had not worn a uniform in over 20 years (except for ceremonial occasions) and was not in uniform at the time of this incident, and he had not been assigned to the Turnpike since 1987. Johnson believes his photo was included in the array for nefarious purposes, but he does not claim that Silver or Fuentes caused his photo to be included.

[3] Johnson did not receive an exceptional evaluation for physical fitness.

criminal involvement of a federal law enforcement officer in an investigation Johnson was supervising.[4] However, the State Police presented four separate letters offering to settle the matter while it was pending. Johnson said his counsel in those proceedings never conveyed these offers to him but that had he known about them before, he "would have took [them] and ran." App. 91, 114. In 2014, an administrative law judge sustained three of the four charges against Johnson and in 2015, Johnson retired.

Johnson asserts that Fuentes has withheld his retired law enforcement credentials and emoluments. Based on newspaper articles, Johnson identified a white trooper who was permitted to retire while disciplinary proceedings were pending and received retirement benefits. He also initially identified another trooper who he alleged received retirement benefits despite criminal charges, but in his deposition, Johnson stated that he did not know whether that officer was charged with criminal offenses or subject to discipline.

B

Johnson filed a complaint against Defendants under 42 U.S.C. § 1983, alleging that state officials "depriv[ed] [him] of his rights because he is African-American . . . ." App. 47. After discovery, the District Court granted Defendants' motion for summary judgment because: (1) Johnson's race was not the cause of his disciplinary charges or his transfer, as officers of other races were subject to the same employment actions; (2) his "unsubstantiated accounts" were insufficient to create a factual dispute, App. 15; and

---

[4] Johnson acknowledged in his deposition that during his time with the State Police, disciplinary actions were brought against black, white, Hispanic, male, and female troopers.

(3) "[t]he use of the terms 'black ass' and 'with your brothers' are stray comments that do not constitute a discriminatory action by Silver," App. 15.[5]  Johnson appeals.

## II[6]

Johnson has not identified which of his constitutional or statutory rights were allegedly violated, but we, like the District Court, interpret his § 1983 claim—alleging that he was treated differently because of his race—to assert a violation of the Equal Protection Clause.

Section 1983 provides a means to sue a state actor for violating a federal constitutional or statutory right such as the right to equal protection.  42 U.S.C. § 1983. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State

---

[5] The District Court construed Johnson's complaint as also involving claims for disparate treatment, hostile work environment, or other employment-related retaliation, **App. 12-13, 15,** and concluded that summary judgment should be granted to Silver and Fuentes because Johnson failed to comply with Title VII's administrative exhaustion requirement and § 1983 cannot be a means to seek relief for a violation of a right established by Title VII.  Johnson does not appeal that ruling.

[6] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  We have jurisdiction pursuant to 28 U.S.C. § 1291.

Our review of the District Court's grant of summary judgment is plenary.  Resch v. Krapf's Coaches, Inc., 785 F.3d 869, 871 n.3 (3d Cir. 2015).  We apply the same standard as the District Court, viewing facts and making all reasonable inferences in the non-movant's favor.  Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of h[is] case with respect to which []he has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. "The central purpose of the Clause 'is to prevent the States from purposely discriminating between individuals on the basis of race.'" Doe ex rel. Doe v. Lower Merion Sch. Dist., 665 F.3d 524, 543 (3d Cir. 2011) (quoting Shaw v. Reno, 509 U.S. 630, 642 (1993)). To bring a claim under § 1983 for the denial of equal protection based on race, a plaintiff must show: (1) he is in a protected class; (2) the defendant acted under the color of state law, Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005); and (3) the defendant treated the plaintiff differently because of his race, Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992), or, put differently, acted with a racially discriminatory intent or purpose, Antonelli v. New Jersey, 419 F.3d 267, 274 (3d Cir. 2005). One way a plaintiff can prove that a state actor acted with discriminatory intent is by showing that the plaintiff "receiv[ed] different treatment from that received by other individuals similarly situated." Keenan, 983 F.2d at 465 (alteration in original) (citation omitted). "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).

It is undisputed that Fuentes and Silver are state actors who acted under color of law. Johnson, however, has not shown that Fuentes or Silver intentionally treated him differently on the basis of his race. Thus, he cannot demonstrate a violation of the Equal Protection Clause.

First, there is no evidence that Silver considered Johnson's race when he questioned Johnson and investigated his unit about the failed trailer operation or

7

demanded that Johnson submit a timeline to the Attorney General.  Silver did not file any complaint against Johnson, and his alleged dissatisfaction with Johnson was not reflected in Johnson's 2011 performance evaluation.  Second, with respect to officer transfers, there is no evidence that Johnson was treated differently because of his race.  Similarly-situated troopers of other races and ethnic backgrounds were transferred at the same time he was and for the same reasons, and, like Johnson, several of those transferred needed to drive distances to their new duty stations.  Third, the record does not show that Johnson faced race discrimination regarding disciplinary proceedings.  He acknowledged that during his time as a State Police trooper, disciplinary actions were brought against black, white, Hispanic, male, and female officers.  As to his allegation that he was unfairly required to plead guilty to the charges against him before he could retire, the State Police actually offered to settle the charges on multiple occasions, and Johnson stated that he would have taken such an offer had his counsel informed him of it.  Fourth, Johnson's allegation that Fuentes withheld his retirement credentials and benefits with discriminatory animus fails because he did not show that a similarly situated person was treated differently.  Johnson's proposed comparator comes from a newspaper article, but he offered no evidence that the comparator was disciplined.

Finally, Silver's comment about transferring Johnson's "black ass," App. 105, and his comment that the transfer would put him closer to his "brothers up in Paterson," App. 107, are very troubling.  Of course, race-based comments such as these can be evidence of discriminatory intent, see, e.g., Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 368 (3d Cir. 2008) (noting that "stray remarks" by decision-makers, even if unrelated to the

8

decision-making process, "could provide background evidence that may be critical to a jury's determination of whether the decision-maker was more likely than not acting out of a discriminatory motive"), but here, Johnson has not established a connection between these remarks and any discrimination by Fuentes or Silver in connection with his transfer. Indeed, as discussed above, Silver requested that Johnson and eighteen other officers be transferred. Of the nineteen officers transferred, seventeen were white, one was Hispanic, and one, Johnson, was African-American. Thus, despite these clearly improper remarks, Johnson has not provided a basis upon which a reasonable jury could infer that he was treated differently because of his race in connection with his transfer. Cf. Keenan, 983 F.2d at 466 (finding sufficient evidence of purposeful gender discrimination where the plaintiff detective was prevented from taking or participating in several assignments and the captain said on one of those occasions that "this is no job for a woman"). Thus, the District Court correctly determined that Johnson did not provide a basis upon which a reasonable juror could find that Fuentes and Silver engaged in race discrimination in violation of the Equal Protection Clause, and therefore he cannot prevail on his § 1983 claim.[7]

---

[7] Johnson also asserts that the New Jersey State Police is a racist institution. For this, he relies on Royster v. New Jersey State Police, 110 A.3d 934 (N.J. Super. Ct. App. Div. 2015), aff'd as modified on other grounds, 152 A.3d 900 (N.J. 2017). Evidence and arguments regarding racial discrimination within the State Police were presented at the Royster trial, 110 A.3d at 947, but this does not establish that Johnson himself suffered intentional discrimination.

## III

For the foregoing reasons, we will affirm the order granting Defendants' motion for summary judgment.