**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-2490
_____

ROBERT FLEISHER, D.M.D.,

                           Appellant

v.

STANDARD INSURANCE COMPANY

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 1-10-cv-02678)
District Judge: Honorable Robert B. Kugler
_____

Argued February 6, 2012

Before:   SLOVITER, VANASKIE and GARTH, *Circuit
Judges*

(Filed:  May 17, 2012)

Clifford D. Swift, III, Esq. (*Argued*)
Mark F. Seltzer & Associates
1515 Market Street
Suite 1100
Philadelphia, PA 19102
            *Counsel for Appellant*

Brooks R. Magratten, Esq. (*Argued*)
Pierce Atwood
10 Weybosset Street
Suite 400
Providence, RI 02903

Byrne J. Decker, Esq.
Pierce Atwood
254 Commercial Street
Merrill's Wharf
Portland, ME 04101
            *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

VANASKIE, *Circuit Judge.*

Robert Fleisher, D.M.D., filed suit against the Standard Insurance Company ("Standard"), alleging, *inter alia*, a violation of § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The suit arises out of Standard's decision to reduce Fleisher's monthly long-term disability ("LTD") benefits by the amount of the monthly benefits he

receives under a separate LTD insurance policy issued to him by the North American Company for Life and Health Insurance ("North American"). Fleisher disputes Standard's decision that the North American Policy constitutes "group insurance coverage," and that the monthly payment he receives under that Policy is therefore "Deductible Income" under the Standard Policy. The District Court, applying the deferential abuse of discretion standard of review, granted Standard's motion to dismiss. Specifically, it found that Standard's determination to offset the North American monthly benefit of $1,500 from Standard's monthly obligation of $10,000 is supported by substantial evidence and not unreasonable. Fleisher now appeals this decision. For the reasons stated herein, we will affirm the decision of the District Court.

## I.

During the course of his career as a dentist, Fleisher obtained LTD insurance coverage under two separate policies. In July 1979, Fleisher obtained coverage under a policy issued by North American ("North American Policy") to the American Association of Endodontics ("AAE"), of which Fleisher is a member. The North American Policy provides for LTD benefits of $1,500 per month.

In August 2002, Fleisher became eligible for LTD insurance coverage under a group policy issued by Standard ("Standard Policy") to his employer, Endodontics, Ltd., P.C. ("Endodontics"). The LTD coverage offered by Fleisher's employer is an employee benefit governed by ERISA. *See Shaw v. Delta Air Lines*, 463 U.S. 85, 91 n. 5 (1983) ("An 'employee welfare benefit plan' [governed by ERISA] includes any program that provides benefits for contingencies

such as illness, accident, disability, death, or unemployment."). The Standard Policy provides for monthly LTD benefits equal to a percentage of the plan participant's pre-disability earnings, which in Fleisher's case was a maximum of "$10,000 before reduction by Deductible Income." (A. 61.) The Policy defines "Deductible Income" to include "[a]ny amount you [a plan participant] receive or are eligible to receive because of your disability under *another group insurance coverage*." (A. 72) (emphasis added). The Standard Policy excludes from "Deductible Income" benefits paid under "any individual disability insurance policy." (A. 72.) The Policy does not define either "another group insurance coverage" or "individual disability insurance policy."

In January 2008, Fleisher became disabled and claimed LTD benefits under both

the Standard and the North American policies. Shortly after Fleisher began collecting under both policies, Standard reduced his monthly benefits from $10,000 to $8,500 based on its determination that the North American Policy constitutes "another group insurance coverage," and that the $1,500 in benefits he receives under it is therefore "Deductible Income." Fleisher filed an administrative appeal of Standard's decision, arguing that the North American Policy qualifies as an individual disability insurance policy, and therefore is not subject to deduction. By letter dated July 11, 2008, Standard rejected Fleisher's appeal and continued making the deduction.

On May 26, 2010 Fleisher filed a Complaint in the United States District Court for the District of New Jersey, asserting individual and class claims for wrongful denial of

4

benefits under ERISA, along with various state law claims. After Standard moved to dismiss the Complaint, Fleisher filed an Amended Complaint on September 8, 2010. After Standard moved to dismiss the Amended Complaint, Fleisher filed a Second Amended Complaint ("SAC") on October 1, 2010.[1] The SAC asserts three ERISA claims: breaches of fiduciary duty (Count I) and contract (Count III), both pursuant to § 502(a)(3), 29 U.S.C. § 1132(a)(3), and breach of contract pursuant to § 502(a)(1)(B) (Count II). The SAC seeks restitution for the deductions previously taken as well as injunctive relief to govern future deduction decisions.

Standard moved to dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6). On May 2, 2011, the District Court granted Standard's motion. The District Court initially concluded that the benefits offset determination was governed by "the deferential abuse of discretion standard." (A. 14.) Applying that narrow standard of review, the Court held that Fleisher could not show that Standard's decision reflected an unreasonable interpretation or application of the Standard Policy. The District Court recognized that there was a conflict of interest arising from the fact that Standard both paid benefits and made the offset decision, and that such a conflict had to be considered in deciding whether Standard had abused its discretion. It concluded, however, that Standard's interpretation of pertinent policy provisions was not so close as to make the conflict of interest a determinative factor. The Court also dismissed Fleisher's § 502(a)(3) claims for breaches of fiduciary duty and contract, concluding that Standard's conduct was not improper.

---

[1]Although Fleisher filed the SAC without obtaining leave of the Court pursuant to Fed. R. Civ. P. 15, the Court dismissed the SAC on the merits pursuant to Rule 12(b)(6).

## II.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's grant of a motion to dismiss pursuant to Rule 12(b)(6). *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009). Accordingly, we must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, taken as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (holding that the plausibility pleading standard articulated in *Twombly* applies to all civil actions).

## III.

Fleisher's coverage under the Standard Policy, an employee welfare benefit plan, is governed by ERISA, 29 U.S.C. §§ 1001, *et seq*. Section 502(a)(1)(B) of ERISA creates a civil cause of action for a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." To assert a claim under this provision, a plan participant must demonstrate that "he or she . . . ha[s] a right to benefits that is legally enforceable against the plan," and that the plan administrator improperly denied those benefits. *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006). The

SAC alleges that Standard "breached its obligations under ERISA to Dr. Fleisher . . . by taking a deduction to which it was not entitled and thus unreasonably failing to pay those benefits in full." (A. 140-41.)

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the Supreme Court held:

> [A] denial of benefits challenged under [§ 502(a)(1)(B)] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

When a plan grants its administrator such discretionary authority, "[t]rust principles make a deferential standard of review appropriate," *id.* at 111, and "we review a denial of benefits under an 'arbitrary and capricious' standard." *Orvosh v. Program of Group Ins. for Salaried Emps. of Volkswagen of Am., Inc.,* 222 F.3d 123, 129 (3d Cir. 2000).[2] Likewise, when an administrator acts pursuant to her authority "to construe the terms of the plan," *Critzer v. CBS, Inc.*, 275 F.3d 291, 295 (3d Cir. 2002) or "to act as a finder of facts," *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 438 (3d

---

[2] We have clarified that "[i]n the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 n.2 (3d Cir. 2011) (citing *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n.6 (3d Cir. 2010)). Accordingly, we use the phrases "abuse of discretion" and "arbitrary and capricious" interchangeably when referring to the deferential standard of review applicable in this case.

Cir. 1997), *abrogated on other grounds as recognized* by *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 847 (3d Cir. 2011), we also apply the arbitrary and capricious standard when reviewing those interpretations and factual findings.

"An administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Miller*, 632 F.3d at 845 (quoting *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)) (internal quotation marks omitted). An administrator's interpretation is not arbitrary if it is "reasonably consistent with unambiguous plan language." *Bill Gray Enters. v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001). When a plan's language is ambiguous and the administrator is authorized to interpret it, courts "must defer to this interpretation unless it is arbitrary or capricious." *McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan*, 340 F.3d 139, 143 (3d Cir. 2003). "The determination of whether a term is ambiguous is a question of law. A term is ambiguous if it is subject to reasonable alternative interpretations." *Taylor v. Cont'l Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1233 (3d Cir. 1991) (citations omitted).

Courts defer to an administrator's findings of facts when they are supported by "substantial evidence," which we have "defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Soubik v. Dir., Office of Workers' Comp. Programs*, 366 F.3d 226, 233 (3d Cir. 2004). When reviewing an administrator's factual determinations, we consider only the "evidence that was before the administrator when he made the decision being reviewed." *Mitchell*, 113 F.3d at 440. The Standard Policy

8

vests the administrator with: "[F]ull and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve any questions arising in the administration, interpretation, and application of the Group Policy." (A. 79.) This language clearly triggers application of the deferential abuse of discretion standard of review. *See Abnathya*, 2 F.3d at 45, *abrogated on other grounds* by *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 112 (2008).

In the District Court, Fleisher argued that Standard's decision is not entitled to arbitrary and capricious review, asserting that this deferential standard only applies to an administrator's interpretation of documents that are part of the plan itself. Because Standard's deduction decision was based in part on its finding that the North American Policy—a non-plan document—constituted "group insurance coverage," Fleisher reasoned that *de novo* review is appropriate.

We rejected a similar argument in *Mitchell*, in which a plan administrator denied Mitchell's claim for benefits based on a factual finding about his eligibility, rather than on an interpretation of the terms of the plan. 113 F.3d at 438. The plan vested the administrator with "full discretionary authority to determine all questions arising in the administration, interpretation and application of the plan." *Id.* We held that this "broad grant of discretionary authority to the Administrator" to apply the plan "must encompass the resolution of factual disputes," because such "fact-based determinations of eligibility for LTD benefits are certainly one of the 'questions arising in the administration, interpretation and application of the plan.'" *Id.* at 438-39.

9

The District Court relied on our reasoning in *Mitchell* in rejecting Fleisher's argument for *de novo* review. The Court found that the Standard Policy grants the administrator discretionary authority over "application" of the Policy, which includes the authority to "interpret the plan and make findings of fact necessary to determine eligibility." (A. 14.) Accordingly, the Court reviewed Standard's deduction decision—including its "interpretation and characterization of the North American Policy"—under the arbitrary and capricious standard.

Fleisher apparently reasserts his challenges to this deferential standard now, declaring: "On appeal, this Court reviews the plan administrator's denial of benefits by applying the standard of review the district court should have used initially." (Appellant Br. at 12, citing *Mitchell*, 113 F.3d at 437; *Dewitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 519 n.4 (3d Cir. 1997)). Fleisher, however, offers no further argument to support this apparent challenge, and we discern no error with the District Court's determination that the arbitrary and capricious standard of review applies here. We will therefore apply the arbitrary and capricious standard of review to Standard's denial of benefits, including its determination about the North American Policy.[3]

---

[3] As our dissenting colleague observes, the conflict of interest inherent in the fact that Standard both pays and decides what should be paid is a factor to be considered in applying the abuse of discretion standard of review. It is not, however, inherently a determinative factor. *See Glenn,* 554 U.S. at 117-19. Indeed, "the existence of a conflict," such as the one in this case, "[does] not change the standard of review from abuse of discretion to a more searching review."

**IV.**

The Standard Policy permits it to reduce Fleisher's monthly LTD benefits by any amount paid or payable under "another group insurance coverage." At issue here is the meaning of "group insurance" and whether Standard reasonably determined that the North American Policy falls within the meaning of this term. In this regard, Standard's determination involved both an interpretation of "group insurance" and a factual determination about the North American Policy.

The District Court recognized, and the parties do not dispute, that the term "group insurance" is ambiguous. The Court consulted various insurance law treatises and found that insurers use the term "group insurance" to refer to "at least two subsets of collective insurance products," including "true group insurance" and "franchise insurance." (A. 17.) The Court explained a basic difference between the two:

> Group insurance is an arrangement by which a
> single insurance policy is issued to a central

---

*Doroshow v. Hartford Life & Acc. Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009). Instead, we are to "apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." *Est. of Schwing v. Lilly Health Plan,* 562 F.3d 522, 525 (3d Cir. 2009). While our dissenting colleague expounds at great length on the significance of the conflict of interest in this case, Fleisher does not even mention this factor in his briefs on appeal, let alone explain how it affects the analysis of his claim.

11

> entity—commonly an employer, association, or union—for coverage of the individual members of the group. Franchise insurance is a variation on group insurance, in which all members of the group receive individual policies.

(A. 17, quoting Couch on Insurance § 1:29 (3d ed. 2002)).

The District Court also identified other distinguishing features of the two types of group policies. Under true group insurance policies, the certificate holder is typically an employee of the master policy holder, "all members or employees are automatically enrolled," and the master policy holder works directly with the insurer and is responsible for paying premiums, notifying the insurer about changes concerning which persons are covered at a given time, and submitting members' claims. (A. 17, citing Appleman on Insurance Law & Practice §§ 41, 54 (rev. ed. 1981) ("Appleman")).

Franchise insurance is also issued through a group which holds the master policy that provides for the general terms. While the master policy holder and insurer "'may negotiate' with the insurer to modify or terminate the plan, in all other respects the relationship between members and the insurer is 'precisely that of an insurer dealing directly with its policyholders.'" (A. 18, quoting Appleman § 54.) As the District Court explained:

> [F]ranchise insurance generally has the following characteristics: (1) members of the relevant association or entity may enroll in the plan but are not required to do so; (2) members pay premiums directly to the insurer; (3)

members make claims directly to the insurer; and (4) insurers agree to "waive underwriting, and take all applicants across the board."

(A. 18, quoting Appleman § 54.)

Therefore, "[a]lthough true group insurance and franchise insurance are distinct products," the District Court found that, "'lawyers, legal writers, publishers, and the courts can refer to them individually and collectively as "group insurance."'" (A. 18, citing Holmes' Appleman on Insurance § 2.5 (2d ed. 2002)). On this basis, the Court concluded that the term "group insurance" is ambiguous because it "may reasonably refer to at least two different types of collective insurance products." (A. 19.)

Our dissenting colleague, relying upon "*general principles of contract law*," (Dissenting Op. at 4), suggests that we should apply the well-established principle that ambiguous terms in an insurance policy "must be construed most strongly *against* the insurance company that drafted it." (Id. at 3). He vigorously asserts that our review must be "*informed both by [such] general principles of contract law and by ERISA's purposes as manifested in its specific provisions.*" (Id. at 4, quoting *Burstein v. Retirement Account Plan for Emp. Of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 385 (3d Cir. 2003) (emphasis added by Judge Garth) (internal quotation marks and citations omitted)). The dissent argues that the result here is inequitable because "the Standard Policy to which Dr. Fleisher subscribed at no time alerted him to its deductible provisions, nor did Standard offer an interpretation of those

13

provisions so that a layperson such as Dr. Fleisher could assess the protection that he was seeking."[4] (Id. at 3-4.)

With all due respect to our dissenting colleague, we think that he misapprehends the nature of the abuse of discretion standard of review. Notably, the case he cites for applying general principles of contract law to interpret ERISA plan terms, *Burstein,* 334 F.3d 365, did not involve review of a benefits determination under an abuse of discretion standard, but instead concerned a conflict between a summary plan description and the plan document itself. And while we have applied the doctrine of *contra proferentem* in the context of ERISA claims, we have done so only to decide whether the plan documents confer discretionary authority on the plan administrator so as to trigger deferential review, a decision we make under a plenary standard of review. *See, e.g., Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1254, 1257-58 (3d Cir. 1993). Where, however, the abuse of discretion standard applies, we have made clear that we must defer to the plan administrator's interpretation of ambiguous plan terms unless that interpretation is arbitrary or capricious. *See McElroy* 340 F.3d at 143 ("Because the language of the . . . Plan is equivocal, the plan administrator was authorized to interpret it, and we must defer to this interpretation unless it is arbitrary or capricious.").

---

[4] It bears mentioning that the record before this Court does not include an actual insurance policy, but does include the ERISA Summary Plan Description ("SPD") for the disability coverage provided by Standard. The dissent is correct that the SPD does not describe its deductible provisions in large block lettering or in any other way that would call a reader's attention to this specific provision.

14

The dissent's application of the *contra proferentem* doctrine would supplant deference to an administrator's reasonable interpretations of ambiguous terms with a presumption that such an interpretation is unreasonable. In addition to undermining the established deferential standard, contrary to Supreme Court authority, such an approach also eviscerates the provision of the Standard Policy which granted the administrator discretion in the first place. Indeed, the administrator can hardly be said to exercise discretion if her interpretations of the policy's terms is burdened by a presumption against the insurer.

Notably, every Court of Appeals to have addressed the issue has concluded that a court reviewing a benefits decision for abuse of discretion cannot apply the principle that ambiguous plan terms are construed against the party that drafted the plan. *See, e.g., D & H Therapy Assoc., LLC v. Boston Mut. Life Ins. Co.*, 640 F.3d 27, 35 (1st Cir. 2011) ("We have emphasized that our review of whether a plan administrator abused its discretion does not require that we determine either the 'best reading' of the ERISA plan or how we would read the plan de novo. We have also noted that the doctrine of contra proferentem does not apply to review of an ERISA plan construction advanced by an administrator given authority to construe the plan.") (citations omitted); *Marrs v. Motorola, Inc.*, 577 F.3d 783, 787 (7th Cir. 2009) ("[A]lthough, generally, ambiguities in an insurance policy are construed in favor of an insured, in the ERISA context in which a plan administrator has been empowered to interpret the terms of the plan, this rule does not obtain.") (citation and quotation marks omitted); *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 260-61 (4th Cir. 2009); *White v. Coca-Cola Co.*, 542 F.3d 848, 857 (11th Cir. 2008); *Lennon v. Metro. Life*

15

*Ins. Co.,* 504 F.3d 617, 627 n.2 (6th Cir. 2007); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100-01 (10th Cir. 1999); *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 554 (9th Cir. 1995); *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 443-44 (2d Cir. 1995) ("[A]pplication of the rule of *contra proferentum* is limited to those occasions in which this Court reviews an ERISA plan *de novo.*").  District Courts in our Circuit also have recognized that the doctrine of *contra proferentem* does not apply where, as here, judicial review is constrained by the abuse of discretion standard.  *See, e.g., Brown v. First Reliance Standard Life Ins. Co.*, 2011 WL 1044664, at \*16, n.13 (W.D. Pa. 2011); *Doe v. Hartford Life & Accident Ins. Co.*, 2008 WL 5400984, at \*4 (D. N.J. 2008).

The dissenting opinion reads as if we were interpreting an ambiguous term in an insurance policy under a *de novo* standard of review.  It alludes to notions of contracts of adhesion and reasonable expectations of the insured that populate cases interpreting insurance policies in the first instance.  Those concepts are simply not applicable where, as here, the ERISA plan document makes the plan administrator the competent authority to interpret ambiguous plan provisions in the first instance.  *See Kimber*, 196 F.3d at 1101 ("[T]he reasonable expectation doctrine is inapplicable to the review of an ERISA disability benefits plan under the arbitrary and capricious standard.").  As Judge Cudahy explained in *Morton v. Smith*, 91 F.3d 867, 871 n.1 (7th Cir. 1996):

> Courts invoke [the *contra proferentem*] rule when they have the authority to construe the terms of a plan, but this authority arises only when the administrators of the plan lack the

16

discretion to construe it themselves. . . . When the administrators of a plan have discretionary authority to construe the plan, they have the discretion to determine the intended meaning of the plan's terms. In making a deferential review of such determinations, courts have no occasion to employ the rule of *contra proferentem*. Deferential review does not involve a construction of the terms of the plan; it involves a more abstract inquiry—the construction of someone else's construction.

(internal citations omitted.)

Ultimately, we think Judge Garth is mistaken inasmuch as he implies that Fleisher has somehow been the victim of a contract of adhesion, or that he was otherwise misled by Standard. Although the Standard Policy did not define the terms "group insurance" or "individual insurance" or reference the term "franchise insurance," it reposed in the administrator the authority to interpret ambiguous terms. Thus, we are not concerned that plan participants like Fleisher—or, as Judge Garth suggests, sophisticated plan participants like the judges on this panel—are misled by insurance policies such as Standard's. Since the Standard Policy vested the administrator with discretion to interpret the Policy, under our well-established case law we have no option but to uphold this interpretation unless it is arbitrary or capricious. As our dissenting colleague observed in another ERISA case, "a court must *actually apply* the correct standard [of review]; *mere lipservice and mere citation* to a standard of review will not suffice." *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 399 (3d Cir. 2003) (Garth, J.,

17

dissenting). In this case, application of the deferential standard of review precludes reliance upon the general principles of contract law on which the dissent rests. Whether we would reach a different interpretation under *de novo* review is therefore irrelevant.

Having established that "group insurance" is ambiguous and that the Standard administrator is authorized to interpret it, the District Court evaluated the features of the North American Policy to determine whether Standard could reasonably interpret it as a type of group insurance coverage. The Court observed several features of the North American Policy consistent with franchise insurance, including that the Policy was "issued through a group, [the AAE], whose members could individually apply for coverage," and that "the members otherwise interacted directly with the North American regarding coverage and premiums." (A. 19.) The Court also noted that "the Certificate, which [Fleisher] attaches to the Complaint, clearly states that it is issued pursuant and subject to 'group policy PG A320,' which is held by AAE, and that [Fleisher] obtained the Certificate as a member of the AAE." (A. 19.) The Court acknowledged Fleisher's argument that the Policy "bears certain features characteristic of individual insurance policies," but concluded that the Policy can nonetheless be "reasonably characterized as a franchise policy." (A. 19). On this basis, the Court dismissed Fleisher's § 502(a)(1)(B) claim.

Fleisher challenges this conclusion on appeal, urging that Standard's determination is unreasonable because it is based on a factual finding—that the North American Policy is franchise insurance—that is not supported by the evidence. Instead, Fleisher contends that the evidence supports the

18

conclusion that the Policy "is an individual disability insurance policy with all the characteristics of an individual disability insurance policy and none of the characteristics of a group insurance policy." (Appellant Br. at 21.)

First, Fleisher notes that unlike franchise insurance, where "insurers agree to 'waive underwriting, and take all applicants across the board,'" (A. 18), the North American Policy "was subject to individual underwriting." (Appellant Br. at 19.) In this respect, he cites portions of the SAC that allege that he was "required to complete a medical questionnaire as part of his application" for the North American Policy, and that the application "itself indicates that North American ordered a Retail Credit Report," and stated that the underwriting procedure may entail "an investigative consumer report." (Id. at 19-20.)

The District Court did not suggest—nor do any of the treatises it cited indicate—that waiver of underwriting is a *sine qua non* of franchise insurance. Rather, the Court listed waiver of underwriting as one of four characteristics that franchise insurance "generally has." (A. 18.) Moreover, the relevant inquiry is whether Standard's interpretation is supported by "substantial evidence," which does not require that the evidence uniformly supports its conclusion, but merely requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Soubik*, 366 F.3d at 233. The District Court correctly found that Standard's interpretation is supported by substantial evidence, including that the North American Policy possesses the other general features of franchise insurance, that it was issued to Fleisher through his membership in a group, and that it states that it is a "group policy." Thus, the fact that the North

19

American Policy lacks one feature of franchise insurance does not outweigh the other evidence in support of Standard's interpretation.

Fleisher next argues that the evidence supports a finding that the North American Policy is an individual disability insurance policy, and therefore excluded from the definition of "Deductible Income" under Standard's Policy. In this regard, Fleisher enumerates six features of the North American Policy that, he claims, it shares in common with individual policies, including: (1) it is individually underwritten; (2) members pay premiums directly; (3) members enroll directly; (4) members submit claims directly; (5) members receive individual billing statements; and (6) it is non-cancellable and guaranteed renewable.

The fact that the Policy shares features in common with individual disability insurance policies is not necessarily inconsistent with a finding that the Policy is franchise insurance. Indeed, three facets of the Policy that Fleisher cites as evidence of an individual policy—direct payment of premiums, direct enrollment, and direct submission of claims—are among those that the District Court identified as characteristics of franchise insurance. Thus, Fleisher's argument that the Policy has "none of the characteristics of a group insurance policy" is plainly untrue, as these three features in fact support the conclusion that the Policy is franchise insurance, which itself is a type of group insurance.[5]

_____

[5] To the extent that Fleisher attempts to demonstrate that the Policy is not "true" group insurance, this argument is unavailing. Fleisher has conceded that the term "group insurance" is ambiguous, and that "franchise insurance" is a

20

Moreover, as the District Court aptly observed, even accepting that the Policy possesses some features of individual policies, it "is certainly not a pure individual policy because it plainly states that it was issued pursuant to a group policy held by AAE." (A. 16-17.) Indeed, there are several features of individual policies that the North American Policy does not possess. Notably, unlike individual policies, Fleisher has only a certificate of coverage, which is expressly subject to the terms of the group policy and to termination of the group policy, as well as numerous other conditions determined by the holder of the group policy. (Appellee Br. at 12-13.)

Finally, Fleisher argues that the District Court "ignored the most compelling evidence that the North American Policy is an individual rather than a group policy, Reassure America's own characterization of the policy it sold to Dr. Fleisher." (Appellant Br. at 22.) The SAC alleges that in his administrative appeal of the deduction decision, Fleisher submitted a letter from Ken Selasky, the Assistant Vice President at Reassure America, which administers the North American Policy. Selasky's letter states: "[E]ven though this policy was issued through this group [referring to AAE], it is an individual income policy and we are treating all aspects of Dr. Fleisher's claim as an individual disability income policy." (Appellant Br. at 22.)

While the opinion of the administrator of the North American Policy as to the nature of the policy is not

---

type of "group insurance." Therefore, the relevant inquiry is whether there is substantial evidence that the Policy is franchise insurance. The question whether it is "true" group insurance is irrelevant.

21

immaterial, we do not consider it sufficiently persuasive to establish that Standard's contrary interpretation was unreasonable. Indeed, under the arbitrary and capricious standard of review, the relevant inquiry is not whether it is reasonable to interpret the North American Policy as an individual insurance policy, but whether it is unreasonable to interpret it as group insurance. We conclude that this determination is not unreasonable: the North American Policy exhibits several characteristic features of franchise insurance, which is a species of group insurance, and Fleisher's arguments to the contrary do not undermine the sufficiency of this evidence.[6]

---

[6] As noted above, the dissent makes much of a point not argued by Fleisher in his principal brief or in his reply brief: the conflict of interest arising from the fact that Standard benefits from its decision to set off the North American payment of $1,500 per month from the Standard's monthly obligation of $10,000. The type of conflict here is not uncommon. *See Marrs*, 577 F.3d at 789 ("[A] conflict of interest . . . is a given in almost all ERISA claims".). We have recognized that a conflict may be determinative where the issue is close. *See Est. of Schwing*, 562 F.3d at 526. We agree with the District Court's conclusion that the issue in this case is not so close as to make the conflict a tiebreaking factor. Franchise insurance is a species of group insurance, Fleisher procured coverage through a group, the coverage he obtained had a number of features of franchise insurance, and he received only a certificate of insurance, not a policy. It plainly was not unreasonable to consider the North American Policy group insurance, and the conflict of interest does not alter this conclusion.

22

## V.

For the foregoing reasons, we will affirm the District Court's decision dismissing this action.

Fleisher v. Standard Insurance Co.
No. 11-2490
GARTH, *Circuit Judge*, dissenting.


While I have no quarrel with the majority's statutory analyses, I reach a different result and, therefore, respectfully dissent.

I have looked beneath the surface of the principles upon which the majority rely, to the fair and equitable roots of this controversy with Standard. As a result, I would remand this case to the District Court to explore and determine the equitable factors in play, as well as the conflict and ambiguities that have resulted in a complete frustration of Dr. Fleisher's objectives and expectations.

Dr. Fleisher, a dentist specializing in endodontistry, in an effort to protect his future earning capacity, subscribed to a North American Disability Policy in 1979. He was to receive a benefit of $1,500 a month. At that time, he was not disabled, but he was aware of the possibility that he might be in future years. Accordingly, when he became eligible for a group policy, he subscribed to one written by the Standard Insurance Company. This was some 23 years after he had subscribed to his initial disability policy with North American. His later subscription to the Standard policy was obviously to protect and augment his financial livelihood, by insuring that he had increased protection in the event he became disabled.

In January 2008, he became disabled and claimed the benefits under both policies, Standard, for the first time, informed him that he could not receive the $10,000 a month which was the amount of the policy which he had taken out. Why? Because the 1979

1

policy to which he had originally subscribed was, in Standard's opinion, a "group policy" and, as such, the amount of the benefits which Dr. Fleisher could receive from the Standard policy was reduced by the amount of the North American policy benefit that he would henceforth receive.

Accordingly, at this time, Dr. Fleisher, who is no longer eligible for disability benefits from any company and can no longer subscribe for disability protection, is remitted to $10,000 a month, rather than $11,500 a month, the sum total of both policies which he had taken out.

Why should this be, when the Standard policy at no time brought to Dr. Fleisher's attention the deductibility provision of the Standard policy, nor did it acquaint him with any definitions of the terms: "group policy", " individual policy", or "franchise policies"?

All members of the majority and I (as well as the District Court judge) agree that the terms and language of the Standard Insurance policy are ambiguous. Nowhere in the Standard policy are the terms "group insurance" and "individual insurance" defined. No matter how diligently one may look at or study the Standard policy, there is no guidance to help the policyholder determine the characteristics of either type of policy or how these characteristics would affect the benefits that Dr. Fleisher expected to receive.

Moreover, although the District Court and the majority here have focused their analysis on "franchise policies," and have detailed the characteristics of a "franchise policy," neither the Standard policy nor the individual policy that Dr. Fleisher originally purchased, even mention, much less define, the term "franchise policy." Yet the

2

characteristics and definition of a "franchise policy" dominate and control the holding of both the District Court opinion and the majority opinion here.

"Franchise policies" were never described in any insurance document that Dr. Fleisher had received, but are rather a matter of characterization that can be found only in an insurance treatise such as *Appleman's*.

As to the characterization of the individual and group policies, there was no warning or alert given to Dr. Fleisher which could send up a red flag warning that he should not purchase the Standard policy with its deductible provisions or that if he did, he would not achieve the disability benefits that he sought to receive. (See footnote 1, supra.) In other contexts, our society has taken great pains to alert consumers of products detrimental to their well-being: warnings appear in large letters in the advertisements and on the packaging of tobacco, drugs, and alcohol. Large block lettering or other emphatic warnings on the Standard policy might have alerted Dr. Fleisher to the problem that he now faces.

It is well established that when the language of an insurance policy is ambiguous, that language must be construed most strongly *against* the insurance company that drafted it. American Legacy Foundation, R.P. v. National Union Fire Ins. Co., 623 F.3d 135, 139 (3d Cir. 2010) (quoting Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195-96 (Del. 1992)).

In the present case, the Standard policy to which Dr. Fleisher subscribed at no time alerted him to its deductible provisions, nor did Standard offer an interpretation of those provisions so that a layperson such as Dr. Fleisher could assess the protection that he was

3

seeking. Further, as I have emphasized, the Standard policy makes no mention of the status or even the nature of a "franchise policy," a characterization which governs the District Court's and the majority decisions.

The mere fact that this case implicates ERISA does not mean that these basic fundamental contract principles should be ignored. "In interpreting plan terms for purposes of claims under § 1132(a)(1)(B), we apply a federal common law of contract, *informed both by general principles of contract law* and by ERISA's purposes as manifested in its specific provisions." Burstein v. Retirement Account Plan for Employees of Allegheny Health Education and Research Foundation, 334 F.3d 365, 381 (3d Cir. 2003) (Emphasis added, internal quotation marks omitted, internal citations omitted).

Although there is no direct precedent that confirms ERISA must be considered in light of equitable realities, there are countless instances in which equity has been predominant in ERISA's concerns. See, e.g., Skretvedt v. E.I. DuPont De Nemours, 372 F.3s 193, 196 (3d Cir. 2004) (prejudgment interest on an ERISA award is governed in certain circumstances not by "a rigid theory of compensation for money withheld, but is given in response to *considerations of fairness*. It is *denied when* its exaction would be *inequitable*.") (Quoting Board of Commissioners of Jackson County, Kansas v. United States, 308 U.S. 343, 352, (1939)). (*Italics added.*)

Dr. Fleisher's situation is particularly problematic in light of the conflict under which the Standard administrator labors. The conflict that Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989) and Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105

4

(2008) have recognized where the benefit-giver and the administrator of the benefit are the same, is clearly patent on this appeal. Standard profits by the deduction of $1500 per month from Dr. Fleisher's benefits. It does so by relying wholly upon an extraneous statement in the North American policy, which reads "[h]aving issued group policy PGA320, hereinafter called 'policy.'"

Standard, the District Court, and the majority here discredit North American's own characterization of its own [North American] policy. North American's Assistant Vice President, Mr. Ken Selasky has clearly written and explained that "*even though this [North American] policy was issued through this group [AAE], it is an individual income policy and we are treating all aspects of Dr. Fleisher's claim as an individual disability income policy.*" (Emphasis added).

The District Court and the majority completely overlook the nature of the North American policy, to wit, that it was individually underwritten, non-cancellable, guaranteed renewable, that Dr. Fleisher paid his premiums and made claims directly to North American, that he enrolled for coverage directly with North American, and that he received an individual billing statement. These are not traditional group policy characteristics. These are the basic characteristics of an individual policy.

Our Supreme Court has said that it is "more important (perhaps of great importance) where the circumstances suggest a higher likelihood that it affects the benefits decision . . . to take steps to reduce potential bias and to promote accuracy." Glenn, supra 554 U.S. at 117. In other words, to properly consider the impact of conflict

of interest in determining the reasonableness of an administrator's decision, a reviewing court must consider the closeness of the case and the severity of the conflict of interest.

The District Court, in dismissing Dr. Fleisher's complaint, did not undertake any factfinding or substantial discussion related to the administrator's conflict of interest or its severity. Although the District Court acknowledged that a conflict of interest did in fact exist, the order dismissing Fleisher's complaint summarily concluded that "this is not so close a case that any conflict of interest would break the tie and tip the scales in favor of the plaintiff." Although my colleagues in the majority agree with the District Court, I cannot. This case goes beyond the point of being close, to the point of the administrator's decision being *incorrect*--if ever there were a situation where the administrator's conflict of interest must properly be considered as a factor, this is it!

Indeed, it should be remembered that the District Court dismissed Dr. Fleisher's complaint pursuant to F.R.A.P. Section 12(b)(6). Such a dismissal requires that a Court accept the allegation of the complaint as true, and that it construe the complaint in the light most favorable to the plaintiff.

Dismissal with prejudice is a drastic sanction termed "extreme" by the Supreme Court in *National Hockey League v. Met. Hockey Club.* 427 U.S. 639, 643 (1976), yet, here, the District Court did not only dismiss Dr. Fleisher's complaint, with prejudice, but in doing so, it dealt with the merits of his action.

If the hallmark of the District Court's "arbitrary and capricious standard of review" is reasonableness, and if the relevant inquiry, as the majority of this Court states, "….is not whether it is reasonable to interpret the North America policy as an individual

6

policy, but whether it is unreasonable to interpret it as group insurance," Maj. Op. at 20, then I suggest that we should look to other measures of dismissal for a balancing of what is or is not reasonable.

In *Poulis v. State Farm Fire and Casualty Company,* 747 F.2d 863 (3d Cir. 1984), this Court, by Judge Sloviter, prescribed a test consisting of six (6) factors by which a dismissal with prejudice should be balanced and analyzed.[1] True, the *Poulis* case involved a sanction and did not arise under the ERISA statute, but it is instructive to recognize the length to which we have gone in preserving cases for a merits determination rather than dismissing them on a mere reading of the complaint.

While the context of *Poulis* differs from Dr. Fleisher's claims, it is quite evident that prejudice is one of the most significant factors in determining the appropriateness of dismissal. And what could be more prejudicial or conflict-ridden than the actions of Standard in decreasing Dr. Fleisher's benefits by $1500 a month while it continues to receive premiums based on $10,000 in coverage?

I see no reason why the same sort of analysis should not be employed in an ERISA context where the reasonableness of a dismissal is at issue. A balancing of prejudice and

---

[1] In *Poulis v. State Farm Fire and Casualty Company,* 747 F.2d 863, 868 (3d Cir. 1984), we required the District Court to assess:
1.      The extent of the parties responsibility;
2.      prejudice to the adversary;
3.      a history of dilatoriness;
4.      whether the attorney's conduct was willful or in bad faith;
5.      alternative sanctions; and
6.      the meritoriousness of the claim,
cautioning that dismissal must be  a last resort.

7

a balancing of the factors that result in a dismissal would only improve the analysis of a Section 12(b)(6) dismissal under ERISA.

The majority has held that the District Court was not unreasonable to interpret the North America policy as a group insurance policy. I, of course, disagree using the same loadstar of reasonableness as did the majority.

While I am loathe to discount all of the analyses found in the majority opinion, I cannot accept the fact that fair and equitable means should be so thoroughly disregarded in favor of fitting a legal square peg into a legal round hole. To me, the majority has resolved Dr. Fleisher's problem by merely seeking out some the legal principles which would support its conclusion without regard to the fundamental precepts of equity, fairness and justice[2]. A major consideration on this appeal should include judicial insight to the nature of the problem, the nature of the conflict which the administrator of an ERISA plan must analyze, the nature of the ramifications that may ensue from this Court's decision, and the nature of the actions that a litigant can take to protect a particularly vital interest.

When I assemble these various concerns and concepts in this case, I realize that this entire area of equitable concern has not been addressed in any fashion by the majority. I conclude that we should redeem this failing by remanding this appeal to the District Court for consideration of the various factors and particularly the equitable and fairness elements to which I have adverted.

---

[2] The goal to which we as judges are all wedded, in addition to the oath which we take, is found in Deuteronomy 16:20, "Justice, justice shalt thou pursue."

8

I, therefore, respectfully dissent.